UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBORAH K. MURPHY-DAVIDSON,

    Plaintiff,

Case No. 1:14-cv-779

v.

Hon. Hugh W. Brenneman, Jr.

KENNETH J. STOLL and
COMFORCARE SENIOR SERVICES-
MID MICHIGAN,

    Defendants.
_____/

**OPINION**

       Plaintiff filed the present diversity action against defendants Kenneth J. Stoll ("Stoll") and ComForcare Senior Services - Mid Michigan ("ComForcare") alleging assault and battery, stalking and intentional infliction of emotional distress. *See* Compl. (docket no. 1). In response to plaintiff's complaint, Comforcare filed a counterclaim against plaintiff alleging breach of contract and intentional interference with contractual relations and Stoll filed a counterclaim against plaintiff alleging malicious prosecution. *See* ComForcare's Counter-Claim (docket no. 6 at pp. ID## 22-26); Stoll's Counter-Claim (docket no. 6 at pp. ID## 26-28). This matter is now before the Court on plaintiff's motion for summary judgment on defendants' counterclaims (docket no. 32).

    **I.**    **Backgroun**d

    **A.**    **Plaintiff's complaint**

       Plaintiff set forth the following allegations in her complaint. In this diversity action, plaintiff is a resident of Florida, Stoll is a resident of Montcalm County, Michigan, and ComForcare is a limited liability company which is established and has its principal offices in Stanton, Michigan.

Compl. at ¶¶ 1-3. At all times relevant to the complaint, Stoll was the President and Chief Executive Officer of ComForcare. *Id.* at ¶ 4. On or about August 5, 2013, while plaintiff was at the home of Mr. and Mrs. Donald (Imelda) Kring in Lakeview, Michigan, she was assaulted and battered by her former employer, Stoll. *Id.* at ¶ 10. At that time, Stoll entered the Kring's home and "began to argue with them claiming that they had broken a contract with him." *Id.* at ¶ 11. In response, Mr. Kring "indicated that [p]laintiff had been hired not by them but rather by their daughter to perform housework for her." *Id.* at ¶ 12. Stoll inquired as to plaintiff's whereabouts, and Mr. Kring advised him that plaintiff was in the back bedroom or bathroom. *Id.* at ¶ 13. Stoll, without permission, improperly searched through plaintiff's bag and purse, then went to the back of the house and forced his way into the Krings' guest bedroom, at all times yelling and cursing. *Id.* At that time and place, Stoll "began rifling through [p]laintiff's personal possessions and then assaulted her with visible force by pushing her and twisting her arm and otherwise causing bruising, head injuries, and what now appears to be permanent damage to her arm and shoulder." *Id.*

The "local police" were called and "subsequently arrested [Stoll] for assault and battery." *Id.* at ¶ 14. Upon plaintiff's information and belief, Stoll "later pled guilty or no contest to the criminal charges brought against him by the State of Michigan." *Id.* at ¶ 15. Plaintiff does not allege when plaintiff was arrested or entered a plea in the criminal action.

On August 8, 2013, "because of ongoing, unwanted telephone calls, texts, other communications, threats, and other assaultive behavior" by Stoll, plaintiff obtained a personal protection order ("PPO") against Stoll "for violations of Michigan stalking laws" including M.C.L.

2

§§ 750.411h, 750.411i, and 600.2954. *Id.* at ¶ 16.[1] *See* PPO (*Deborah K. Murphy-Davidson v. Kenneth Stoll*, No. 13-K-17737-PH (8th Cir. Ct. Montcalm County, Michigan) (Aug. 8, 2013)) (docket no. 1-1 at . ID# 8).

Plaintiff alleged that at all times relevant to the complaint, Stoll was acting in his capacity as an agent, employee, president and owner of ComForcare, and "was attempting to use force of arms to enforce a contractual employment provision of the contract between the [p]laintiff and the corporate defendant." *Id.* at ¶¶ 17-18. Based on these allegations, plaintiff has set forth three counts against defendants: Count I (assault and battery); Count II ( civil stalking under M.C.L. § 600.2954); and Count III (intentional infliction of emotional distress). Compl. at ¶¶ 1-41.

**B.   Defendants' Counterclaims**

Defendants responded to the complaint by filing an answer and counterclaims. ComForcare set forth the following allegations in its counterclaim. ComForcare hired plaintiff as an hourly employee on or about April 26, 2013. ComForcare Counterclaim at ¶ 5. At the time of accepting ComForcare's offer of employment as a caregiver, plaintiff was given a copy of a 39-page Employee Handbook, which provided in pertinent part as follows:

> [a]ny employee who makes a private arrangement with a client will cause ComForcare to incur substantial economic damages and losses of types and in amounts which are difficult to compute and ascertain. Accordingly. in addition to any other relief to which ComForcare may be entitled (equitable, monetary and otherwise), ComForcare shall be entitled to liquidated damages the greater of either: a) ten times (10x's) the largest bi-weekly service charge/bill charged for such services in the past for client who is involved in such an agreement, or b) 15.000.00, plus all related attorney/court costs ComForcare incurs in enforcing the Client Service Agreement. Such liquidated damages are intended to represent a reasonable

---

[1] In her complaint, plaintiff erroneously identifies two of the statutes as "MCL §750.411(h), MCL §750.411(I)." Compl. at ¶¶ 9, 16, 27and 35. In their answer, defendants erroneously identify one of the statutes as "MCL 750.41h(1)". Answer at ¶ 9 (docket no. 6).

3

      approximation of actual ComForcare damages and is not a penalty.  Employee will
      be required to pay this amount upon ComForcare's demand.

*Id.* at ¶¶ 6 and 10.

      Plaintiff also signed an "Employee Handbook Release Form" (the "Release Form") on April 26, 2013.  *Id.* at ¶ 7.  ComForcare later referred to the Release Form as an agreement, alleging that:

      8.      The above referenced agreement reads in pertinent part: "I agree to abide by all agency rules and regulations herein, and to uphold the integrity of ComForcare at all times."

      9.      The above referenced agreement further provides in pertinent part: "[f]urthermore, I understand that I am not permitted to make any private employment arrangements with ComForcare's clients or their families. I understand that any such agreement is grounds for immediate termination and may result in my being liable to ComforCare for any damages and/or costs ComForcare suffers as the result of such an arrangement.  These costs may be in excess of $5,000.00."

*Id.* at ¶¶ 8-9.

      In the spring or summer of 2012, Donald and Imelda Kring entered into an exclusive written contract with ComforCare for in-home care services for the months they resided in Michigan.  *Id.* at ¶ 11.  Beginning in April, 2013, plaintiff "was one of two ComForcare employees assigned to the Krings, for 9 hours per day, 7 days per week."  *Id.* at ¶ 12.  In accepting ComForcare's offer of employment, plaintiff agreed to abide by all of the rules contained in the Employee Handbook, and specifically agreed not to enter into private care arrangements with ComForcare's clients or their families.  *Id.* at ¶ 14.

      On or about June 3, 2013, Mr. or Mrs. Kring called ComForcare and informed it that its services would no longer be needed.  *Id.* at ¶ 15.  ComForcare called plaintiff and another caregiver assigned to the Kring home to offer them a reassignment.  *Id.* at ¶ 16.  Plaintiff "falsely

4

informed" ComForcare's scheduler, Ray Wireman, that she intended to enroll in college full-time and was not interested in another assignment at that time. *Id.* at ¶ 17. Plaintiff also "invited Ms. Wireman to check back with her in January, 2014, for the purpose of accepting future assignments, and remained on the books as a ComForcare employee." *Id.* However, in late May or early June 2013, plaintiff "entered into a clandestine private contractual relationship with the Krings or their family member for their continued care in Michigan, in direct contravention and breach of the above stated employment agreements." *Id.* at ¶ 18.

In entering into a private arrangement for care with plaintiff, an employee of Comforcare, "the Krings breached their contract with ComForcare, resulting in loss of revenue." *Id.* at ¶ 21. Plaintiff knew of the existence of the contract between the Krings and ComForcare, and "unjustifiably and intentionally instigated, induced or persuaded the Krings to terminate their contract with ComForcare in favor of the Krings or a family member entering into a private agreement with her for Caregiver services." *Id.* at ¶¶ 22-23. As a result of plaintiff's "intentional invading and interference with the contractua1 relationship between the Krings and ComForcare", ComForcare suffered economic damages, and continues to suffer economic damages. *Id.* at ¶ 24. These allegations form the basis for ComForcare's counterclaims against plaintiff for breach of contract (Count I) and (intentional interference with contractual relations (Count II). *Id.* at ¶¶ 1- 24.

Stoll adopted ComForcare's allegations and set forth additional allegations in his counterclaim. On August 5, 2013, plaintiff initiated a criminal proceeding against Stoll by making a false police report that Stoll had assaulted and battered her. Stoll Counterclaim at ¶ 31. Specifically, plaintiff falsely reported to Michigan State Trooper Michael Umphrey that as a result of the assault and batter, "she sustained physical injury and sought medical treatment." *Id.* at ¶ 32.

Plaintiff became a complaining witness in a criminal action brought against Stoll in *People of the State of Michigan v. Kenneth J. Stoll*, No. 1:13-SM-483-ST (64-B District Court). *Id.* at ¶ 33. The criminal action involved a misdemeanor complaint of assault and battery contrary to M.C.L. § 750.81. *Id.* at ¶ 33. This statute provides in pertinent part that, "[e]xcept as otherwise provided in this section, a person who assaults or assaults and batters an individual, if no other punishment is prescribed by law, is guilty of a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $500.00, or both." M.C.L. § 750.81(1). On November 2, 2013, Stoll paid an interim bond "under the threat of arrest on the misdemeanor complaint and warrant." *Id.* at ¶ 34.

Stoll alleged that approximately two months later, on January 6, 2014, "the above referenced criminal charge was dismissed by the People of the State of Michigan with prejudice, upon motion of the assistant prosecuting attorney." *Id.* at ¶ 35 (emphasis added). The order from the 64-B District Court, however, states that the criminal charge was dismissed *without* prejudice. *See* Motion/Order of Nolle Prosequi (stating that "**IT IS ORDERED**: 1. Motion for nolle prosequi is granted and the case is dismissed without prejudice") (docket no. 6-1 at p. ID# 35). The order did not provide any explanation. *Id.*

Stoll alleged that plaintiff reported that he assaulted her and initiated the subsequently dismissed criminal prosecution for a purpose other than bringing Stoll to justice in the criminal justice system. Stoll Counterclaim at ¶ 36. Rather, plaintiff's initiation of criminal charges against Stoll "was in part motivated by her desire to avoid substantial civil liability for breach of employment contract and/or tortious interference with contractual relations." *Id.* at ¶ 37. As a result of the criminal prosecution, Stoll suffered anxiety, emotional distress, public humiliation, loss of reputation, and defamation, and also incurred attorney fees in defending the prosecution and spent

6

time meeting with a State Police investigator, "which distracted from his business pursuits." *Id.* at ¶¶ 38-41. These allegations form the basis for Stoll's counterclaim for malicious prosecution (Count III). *Id.* at ¶¶ 31-41.

## II.   Legal Standard

Plaintiff seeks summary judgment on all three counterclaims. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

7

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### III. Discussion

#### A. ComForcare's counterclaims

#### 1. Count I (breach of contract)

Plaintiff seeks summary judgment on ComForcare's counterclaim for breach of contract which is based upon the Employee Handbook and the Release Form.

##### a. Employee Handbook

ComForcare's Employee Handbook states in pertinent part under the heading "**EMPLOYMENT STATUS**":

> ComForcare is an at-will employer therefore you are an at-will employee. This means that the employment relationship may be terminated at any time by either the employer or the employee, with or without cause and with or without notice. *Nothing in this Handbook is intended to create a contract between you (Employee) and ComForcare*. All employment is classified as part-time, contingent employment. Your work schedule is based on client needs. Hours of work are determined by your availability and available work assignments at any given time, therefore assignments cannot be guaranteed. ComForcare is an at-will employer.

Employee Handbook (docket no. 33-1 at p. ID# 115) (emphasis added).

ComForcare cannot rely on the Employee Handbook as the basis for an alleged breach of contract because it was not intended to create an employment contract between plaintiff and ComForcare. As this Court previously explained in *Pacheco v. Boar's Head Provisions Co.*, No. 1:09-cv-298, 2010 WL 1323785 (W.D. Mich. March 30, 2010):

> Under Michigan law, written statements in a company policy and procedure manual can give rise to contractual obligations on the part of the employer. *See Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880, 890 (1990).

> Michigan cases have repeatedly held, however, that an employee handbook "will not create enforceable rights when the handbook expressly states that such provisions are not intended to create an employment contract." *Lytle v. Malady*, 458 Mich. 153, 579 N.W.2d 906, 913 (Mich. 1998) (citing *Heurtebise v. Reliable Bus. Computers, Inc.*, 452 Mich. 405, 550 N.W.2d 243 (Mich.1996)); *see also Highstone v. Westin Eng'g, Inc.*, 187 F.3d 548, 552 (6th Cir.1999) (declining to find a contractual obligation where the handbook stated that "[i]t is not a contract with any employee"); *Blake v. Mesaba Airlines*, No. 99-1437, 2000 WL 712384, at *1-4 (6th Cir. May 24, 2000) (holding that an employee handbook containing an express disclaimer of contractual intent and an express reservation of the right to amend could not support a breach of contract claim).

*Pacheco*, No. 1:09-cv-298, 2010 WL 1323785 at *2 (footnote omitted). Here, ComForcare's Employee Handbook expressly stated that "[n]othing in this Handbook is intended to create a contract between you (Employee) and ComForcare." This language did not create an employment contract between plaintiff and ComForcare based upon the Employee Handbook. *Id.* (an employee handbook could not support a claim for breach of contract where the handbook stated that it was not an employment contract); *Lytle*, 458 Mich. at 168-70. Accordingly, plaintiff's motion for summary judgment will be granted to the extent that ComForcare's breach of contract claim (Count I) is based upon the Employee Handbook.

### b. The Release Form

ComForcare contends that the Release Form was a separate contract between plaintiff and ComForcare which involved, among other things, an agreement by plaintiff not to make a private employment arrangement with ComForcare's clients. "In Michigan, the essential elements of a valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v. Leja*, 187 Mich. App. 418, 422; 468 N.W.2d 58 (1991) *citing Detroit Trust Co. v. Struggles*, 289 Mich. 595; 286 N.W. 844 (1939). Courts "give contractual language its plain and ordinary meaning, avoiding

9

technical and constrained constructions." *English v. Blue Cross Blue Shield of Michigan*, 263 Mich. App. 449, 471, 688 N.W.2d 523 (2004).

Under Michigan law, "[c]ontractual covenants against competition, or noncompete clauses, are governed by MCL 445.774a(1)." *Asmi v. Nasir*, No. 316208, 2014 WL 5690503 at *6 (Mich. Ct. App. Nov. 4, 2014). This statute provides in pertinent part:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

M.C.L. § 445.774a(1).

In addition to acknowledging receipt of the Employee Handbook, the Release Form included language in which plaintiff agreed not to compete with ComForcare by making a separate employment arrangement with ComForcare's clients or the clients' families, providing in pertinent part:

> Furthermore, I [plaintiff] understand that I am not permitted to make any private employment arrangements with ComForcare's clients or their families. I understand that any such arrangement is grounds for immediate termination and may result in my being liable to ComForcare for any damages and/or costs ComForcare suffers as a result of such an arrangement. These costs may be in excess of $5,000.00.

Release Form.

Here, it is undisputed that plaintiff and Stoll executed the Release Form on April 26, 2013. *See* Release Form (docket no. 38-1 at p. ID# 306); Murphy-Davidson Dep. Trans. (docket no. 38-1 at p. ID# 311). In this regard, plaintiff understood that she was bound by the damages clause

10

of the Form. When ComForcare's counsel asked plaintiff "did you know that you would responsible [sic] for damages and costs if you breeched [sic] employment contract with ComForcare?" plaintiff responded "Yes." Murphy-Davidson Dep. Trans. (docket no. 38-1 at p. ID# 312).

ComForcare has submitted other evidence to establish this alleged breach by the Krings. David England, the son-in-law of Donald and Imelda Kring, executed an affidavit stating in pertinent part that: plaintiff was one of the ComForcare employees assigned to provide the Krings with caregiver services; that "[s]hortly after [plaintiff] began working, my in-laws hired her direct and discontinued their arrangement with ComForcare"; and, that plaintiff worked "in the same capacity and was paid more money than what she was earning at ComForcare." David England Aff. (docket no. 38-2 at p. ID# 344). In addition, Mary England, the Kring's daughter, stated in an affidavit: that she was only being paid $8.00 per hour by ComForcare; that "[a]fter a few weeks, at the encouragement of [plaintiff], my parents hired her direct and discontinued their arrangement with ComForcare"; that plaintiff "began working directly" for the Krings "in the same capacity," and the Krings paid for those services "primarily in cash"; that at the encouragement of her mother, Mary England wrote one or two checks to plaintiff on behalf of her parents "so it would look like [plaintiff] was working for us, not my parents"; and, that plaintiff never performed any work for Mary or David England. Mary England Aff. (docket no. 38-2 at pp. ID## 341-42). Finally, plaintiff testified that she moved in with the Krings. Murphy-Davidson Dep. Trans. (docket no. 38-2 at p. ID# 333).

Viewing the evidence in the light most favorable to the non-moving party (ComForcare), questions of law and fact exist as to whether the Release Form constituted a separate contract between plaintiff and ComForcare, if any such contract was an agreement not to compete

under M.C.L. § 445.774a, whether such a contract was reasonable under the statute, and whether plaintiff violated the terms of any such contract. Accordingly, plaintiff's motion for summary judgment will be denied to the extent that ComForcare's breach of contract claim (Count I) is based upon the Release Form executed by plaintiff and Stoll on April 26, 2013.

### 2. Count II (intentional interference with contractual relations)

Plaintiff seeks summary judgment on ComForcare's counterclaim Count II alleging intentional interference with contractual relations. "The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Services, Inc.*, 268 Mich. App. 83, 89-90, 706 N.W.2d 843 (2005) (internal citations and footnote omitted).[2]

It is uncontested that ComForcare and the Krings entered into a "Home Services Agreement" ("HSA"). *See* HSA (docket no. 38-1 at p. ID# 317). In its counterclaim, ComForcare alleged that the Krings breached the HSA and that plaintiff instigated that breach. ComForcare Counterclaim at p. ID# 25. Under the HSA, the Krings were required to give ComForcare 24 hours notice before terminating service. *See* HSA ("If I want to stop Agency's services, I must give at

---

[2] The Court notes that ComForcare's counterclaim does not allege a cause of action for tortious interference with a business relationship or expectancy, a cause of action which does not require a breach of contract. *See Health Call of Detroit*, 268 Mich. App. at 90 ("In Michigan, tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy. . . The elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing *a breach or termination* of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted.)" (Emphasis added).

least 24 hours advance notice to the office"). In addition, the Krings agreed not to hire ComForcare personnel within 180 days of the discontinuation of services:

> I understand that Agency personnel are employees of Agency. All scheduling must go through Agency's office and that I must request any changes to established schedules from Agency's office. I understand that active Agency employees are not allowed to make private employment arrangements with me or my family within 180 days of the discontinuation of services unless I receive written authorization from the Agency Director, Manager, or Administrator. I also understand that employees who have quit or been terminated by Agency are not allowed to make private employment arrangements with me or my family within 180 days of their termination of employment unless I receive written authorization from the Agency Director, Manager, or Administrator. I understand that by doing so violates this Agreement and that I will be liable to Agency for the financiaJ damage caused. Said financial damage will be the greater of the average gross revenue of the highest: three billing periods within the last three months of service, or $5,000.00, plus all related attorney/court costs Agency incurs in enforcing this Agreement. I promise to pay this amount upon Agency's demand. Agency further reserves the right to discontinue my care if I violate this Agreement, and to apply my deposit to satisfy any unpaid balance.

*Id.*

Contrary to the terms of the HSA, there is evidence that the Krings discontinued or terminated their HSA with ComForcare and hired plaintiff the next day. *See* Affidavits of Mary England and David England; ComForcare Flowsheet (docket no. 38-2 at p. ID# 327) (the "ComForcare Home Care Weekly Flowsheet," which documented time worked by plaintiff, indicated that she worked 9 hours for the Krings on Monday, June 3, 2013, and that "Clients Canceled Services" as of Tuesday, June 4, 2013).

ComForcare has presented evidence that the Krings discontinued, terminated or canceled their contract with ComForcare on June 3, 2013 and hired plaintiff to work for them the next day. To prevail on its counterclaim of tortious interference with contractual relations, ComForcare must establish that the Krings breached their contract with ComForcare. *See Health*

*Call of Detroit*, 268 Mich. App. at 89-90. Viewing the evidence in the light most favorable to the non-moving party (ComForcare), questions of fact exist as to whether plaintiff tortiously interfered with the Krings' HSA. Accordingly, plaintiff's motion for summary judgment will be denied on ComForcare's counterclaim for tortious interference with contractual relations (Count II).

### B. Stoll's counterclaim, Count III (malicious prosecution)

Finally, plaintiff seeks summary judgment on Stoll's counterclaim for malicious prosecution. Under Michigan law, "actions for malicious prosecution have historically been limited by restrictions that make them difficult to maintain." *Matthews v. Blue Cross & Blue Shield of Michigan*, 456 Mich. 365, 377, 572 N.W.2d 603 (1998). To prevail on a claim of malicious prosecution:

> [t]he plaintiff has the burden of proving (1) that the defendant has initiated a criminal prosecution against him, (2) that the criminal proceedings terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

*Matthews*, 456 Mich. at 378. "Generally, courts have held that where termination results from a compromise or settlement or is brought about by an action of the accused as a courtesy or favor or by some act of the accused that prevents the litigation, there is no favorable termination that will serve as a basis for a cause of action for malicious prosecution." *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 21, 672 N.W.2d 351 (2003), quoting *Cox v. Williams*, 233 Mich.App. 388, 394, 593 N.W.2d 173 (1999).

Plaintiff contends that Stoll's malicious prosecution action fails because: the prior proceedings were not terminated in his favor; there was no absence of probable cause for those proceedings; and Stoll has provided no proof of malice. Plaintiff's contention is without merit. A

14

malicious prosecution claim arises from a criminal prosecution, in this case the misdemeanor charge filed against Stoll in the 64-B District Court. Plaintiff's argument for summary judgment is based upon the fact that Montcalm County Circuit Court Judge Kreeger issued an *ex parte* personal protection order against Stoll on August 8, 2013. However, the issuance of a *ex parte* personal protection order is not a criminal proceeding. Rather, it is an *ex parte* "injunctive order issued by the circuit court or the family division of circuit court restraining or enjoining activity and individuals," M.C.L. § 600.2950(30)(c), which can give rise to a criminal contempt proceeding if violated. *See* M.C.L. § 600.2950(23) ("[a]n individual who is 17 years of age or more and who refuses or fails to comply with a personal protection order under this section is subject to the criminal contempt powers of the court and, if found guilty, shall be imprisoned for not more than 93 days and may be fined not more than $ 500.00").

Here, the criminal proceeding at issue was dismissed without prejudice by the prosecutor. Neither party addresses the legal significance of this dismissal, i.e., whether this dismissal terminated the criminal proceeding in Stoll's favor. Nor do they address any legal authority as to whether plaintiff lacked probable cause for instituting the criminal action against Stoll (*e.g.*, whether obtaining an *ex parte* personal protection order establishes probable cause) or whether plaintiff acted with malice in instituting the criminal claim other than bringing the offender to justice (*e.g.*, whether she instituted the criminal action to retaliate against Stoll). A court need not make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments. *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

Furthermore, questions of fact exist with respect to whether plaintiff initiated the criminal prosecution with malice. At her deposition, plaintiff testified that she told Trooper

15

Umphrey that she wanted to press charges against Stoll. Murphy-Davidson Dep. Trans. (docket no. 38-4 at pp. ID# 401). At the same time, plaintiff stated that she did not know if the police report would "result in anything," but that she wanted to make a report and "stand up for myself." *Id.* When asked the straight forward question of whether her statement to Trooper Umphrey was for the intent to have Stoll criminally prosecuted, plaintiff hedged on her answer.

> Okay. Too many legal things. He assaulted me. I wanted some consequences for his assault. I didn't prosecute -- or I don't know, whatever. I wanted . . .

*Id.* at p. ID# 402. In addition, a jury could view plaintiff's interaction with the county prosecutor as showing only mild interest in actually prosecuting the criminal action. For example, plaintiff testified that she did not fill out the Victim's Rights Packet which she received from the Montcalm County Prosecutor's Office and was unresponsive when asked if she told Ms. Good at the prosecutor's office that she wanted to prosecute Stoll "to the fullest extent of the law." *Id.* Rather, plaintiff testified that when Ms. Good stated that they wanted "to prosecute him to the full extent of the law," plaintiff replied that she was moving to Florida. *Id.* at pp. ID## 402-03. Plaintiff later testified that she wanted Stoll prosecuted. *Id.* at p. ID# 403. Finally, Stoll has presented the affidavit of Mary England, the daughter of Donald and Imelda Kring, which stated in pertinent part that plaintiff stated to her "on more than one occasion" that "she wanted to sue Ken Stoll and close [sic] business." Mary England Aff. at ¶ 13. Viewing the evidence in the light most favorable to the non-moving party (ComForcare), questions of law and fact exist with respect to whether Stoll can establish his counterclaim for malicious prosecution. Accordingly, plaintiff's motion for summary judgment will be denied on Stoll's counterclaim (Count III).

### IV.    Conclusion

For these reasons, plaintiff's motion for summary judgment (docket no. 32) will be **GRANTED** as to Count I of ComForcare's counterclaim for breach of contract based upon the Employee Handbook and **DENIED** in all other respects.  An order consistent with this opinion shall be issued forthwith.


Dated:  July 28, 2015                            /s/ Hugh W. Brenneman, Jr.
                                                 HUGH W. BRENNEMAN, JR.
                                                 United States Magistrate Judge