# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DEBORAH K. MURPHY-DAVIDSON,
an individual,

        Plaintiff,

v.

KENNETH J. STOLL,
an individual, and
COMFORCARE SENIOR SERVICES –
MID MICHIGAN, a limited liability company,

        Defendants,

AND

KENNETH J. STOLL,
an individual, and
COMFORCARE SENIOR SERVICES –
MID MICHIGAN, a limited liability company

        Counter-Plaintiffs,

v.

DEBORAH K. MURPHY-DAVIDSON,
an individual,

        Counter-Defendant.

Case No.: 14-cv-00779

Hon. Ray Kent
Magistrate Judge

_____

## TRIAL BRIEF OF KENNETH J. STOLL AND COMFORCARE SENIOR SERVICES – MID MICHIGAN, LLC

        Thomas A. Ginster (P-40243)
        GINSTER LAW OFFICE, PLC
        Attorney for Kenneth J. Stoll and ComForcare
        203 S. Lafayette St., PO Box 106
        Greenville, MI 48838
        (616) 754-5303
        e-mail: ginster@lawyer.com

## INTRODUCTION

This case arises out of a short-term employment relationship between Deborah K. Murphy-Davidson ("Ms. Davidson"), the plaintiff, and Kenneth J. Stoll ("Mr. Stoll") and ComForcare Senior Services, Mid-Michigan, LLC ("ComForcare"), the defendants and counter-plaintiffs.

ComForcare is a home caregiver franchise of Stanton, Michigan. In 2012 and 2013, ComForcare provided homecare services for an elderly couple of Lakeview, Michigan, Donald and Imelda Kring. During the winter months, the ComForcare franchise in Venice, Florida assumed their care. Ms. Davidson was one of two ComForcare's employees assigned to their care in Michigan.

On 22 July 2014, approximately one year and one month after ComForcare terminated Ms. Davidson's employment for entering into a private pay relationship with the Krings, she sued ComForcare and its co-owner Ken Stoll for alleged assault and battery and civil stalking. Ms. Davidson alleges that Mr. Stoll, while acting within the scope of his employment, assaulted and stalked Ms. Davidson in an attempt to use self-help to enforce an employee non-compete agreement. Ms. Davidson made a criminal complaint against Ken Stoll for assault and battery which was subsequently dismissed by the county prosecutor. Ms. Davidson and the Krings also obtained a personal protection order against Mr. Stoll for alleged stalking.

Mr. Stoll has countersued Ms. Davidson for malicious prosecution, based upon her false report of assault and battery. ComForcare has also countersued Ms. Davidson for tortious interference of its contractual relationship with the Krings and for breach of her employment contract.

**I.   FACTS**

The Stanton ComForcare franchise is a family-run business. Dawn Stoll, Mr. Stoll's wife, is the co-owner and office manager. There are several other office personnel including an account receivable's clerk, a payroll clerk and a scheduler. In 2013, during the non-winter months, they served over 170 clients. On any typical business day, Mr. Stoll drives around the

service area in a clearly marked company car making both announced and unannounced visits to clients and his caregiver employees. In 2013, the agency employed nearly 100 care-givers.

On 26 April 2013, Ms. Davis, along with six other new employees, attended a company orientation. The new employees watched a video, received a packet of materials including a ComForcare Employee Handbook, and signed an acknowledgement for the handbook which also contained a non-compete agreement.[1] Ms. Davidson also signed a confidentiality agreement and agreed to return all property to ComForcare upon termination.

On 5 May 2013, Ms. Davidson was assigned to provide caregiver services to the Krings at their Lakeview residence. She was scheduled to work at the Kring home 9 hours per day, Monday through Friday. During that time, ComForcare employee Emme Manners provided caregiver services to the Krings on weekends.

The Krings were "snow-birds." They had been ComForcare clients in Stanton, Michigan and Venice, Florida since 2012, and had signed a contract for services with both franchise agencies. The week of June 3, 2013, ComForcare in Stanton received notification that the Krings were no longer in need of their services. Ms. Manners was notified and immediately accepted another assignment with another client. Scheduler Rae Wireman's attempts to contact Ms. Davidson were unsuccessful.

The following week, Mr. Stoll made a home visit to the Krings to check on their well-being and gave Mr. Kring a pound of premium coffee at their lakeside residence. At her deposition, Ms. Davidson testified that, unbeknownst to Mr. Stoll, she was hiding in the home of David and Mary England next door. The Englands were the Kring's daughter and son-in law. Ms. Davidson quit working for the Krings after her shift on 3 June 2013, but did not

---

[1] The acknowledgement form, dated 26 April 2013, contains the following unambiguous language immediately above Ms. Davidson's signature. "Furthermore, I understand that I am not permitted to make any private employment arrangements with ComForcare's clients or their families. I understand that any such anangement is grounds for immediate termination and may result in my being liable to ComForcare for any damages and/or costs ComForcare suffers as a result of such an arrangement. These costs may be in excess of $5,000.00.

acknowledge Rae Wireman's text message that the Krings were no longer in need of care until 7 June 2013.[2]

On 10 June 2013, Mr. Stoll appeared at the Lakeview residence that Ms. Davidson shared with her then live-in boyfriend, concerned for her well-being. He left his business card with a note asking her to call him. Shortly after that, Ms. Davidson called the office for the first time since the Krings discontinued service and spoke with Mr. Stoll. Ms. Davidson informed Mr. Stoll that she was going back to school but to keep her on the employment roster for future assignments. It was a cordial conversation and Mr. Stoll had no indication at that time that Ms. Davidson had entered into a private pay relationship with the Krings.

### A. Ms. Davidson's Causes of Action against Ken Stoll for alleged Civil Stalking.

Mr. Stoll 's <u>alleged</u> attempts to contact Ms. Davidson during the week of June 3 to June 27 is basis of Ms. Davidson's stalking complaint. It was also the basis upon which she petitioned and received and obtained a personal protection order against Mr. Stoll for alleged stalking in the Montcalm County Circuit Court. In her petition for a PPO, Ms. Davidson wrote in pertinent part: "he came to my house because I never returned his calls or texts."

At the hearing, Ms. Davidson testified that "[h]e (Mr. Stoll) has repeatedly called me within a 3 week period, over 100 times. . ." (T, 6.) She also testified that Mr. Stoll paid a visit to her home on June 20th when she was not home (at her deposition, she clarified it was the 10th) and had a subsequent telephone conversation the same day. (T, 9-10) She also claimed that from 3 June (the date the Krings discontinued service) to 5 August, Mr. Kring made 4 visits to the Kring home and "would ask the Krings about me." (T, 10) Until June 10th, it is undisputed that Mr. Stoll did not have any personal contact with Ms. Davidson (except for an incidental sighting at Walmart), or knew that she may have been hiding in the Kring home or in the residence of the England's, who lived next door. (T, 10-11) On the 10th, Mr. Stoll received a four minute call from Ms. Davidson who indicated that she was planning on going back to school to advance her

---

[2] Ms. Davidson's cell phone records indicate an exchange of text messages between her and Comforcare scheduler Ray Wireman on 7 June 2013.

4

education, was taking the summer off, and to keep her in mind for future part-time assignments in the fall.

During the PPO hearing, on cross-examination of Ms. Davidson, after being asked her cell phone number, Ms. Davidson changed her testimony, insisting that Mr. Stoll had contacted her 34 or 35 times by phone in the 3 week period. "Oh, honestly at least 34" (T, 27) Later in the hearing, she testified it was 35. (T, 43) Ms. Davidson said she first spoke to Mr. Stoll by phone on 20 June[3], advised him that she was going back to school and not to contact her regarding future assignments. (T, 31)

At her deposition, Ms. Stoll admitted that her testimony at the PPO hearing was "inaccurate." [See 2/23/2015 Deposition Transcript, pages 67-70, 151, 152.]

At her deposition, Ms. Davidson changed her testimony and now claimed that on 27 June 2013, she sent a text message to Mr. Stoll and Rae Wireman to "leave her the hell alone" - the same day that she allegedly parted ways with Mr. Dilley, her live-in boyfriend of three years.[4] The evidence will show that Mr. Stoll did not have texting capability on his phone during the period in question – either to send or receive text messages.[5] Mr. Stoll will testify that the 27 June conversation was his offering Ms. Davidson a part-time assignment, which she declined. The parties do not dispute there was no more contact between the parties until 5 August 2013.[6] It is also undisputed that there was no alleged violation of the Circuit Court's Personal Protection Order issued on 8 August 2013.

---

[3] At her deposition, she said she meant June 10th.

[4] Ms. Davidson's phone records indicate there were no calls or text messages made to Mr. Stoll, Ms. Wireman or any number associated with ComForcare on that date.

[5] The business and personal phone records of the parties indicate that the next phone contact Ms. Davidson had with Mr. Stoll was on 06-27-2013 at 2:18 p.m. for three minutes.

[6] Ms. Davidson also testified to an incidental encounter with Mr. Stoll at the Greenville Walmart at an unspecified date, while she was shopping with her former live-in boyfriend, one Bernard Daren Dilley. She testified that she broke up with Mr. Dilley on 27 June 2013.

5

**B. The assault alleged on 5 August.**

On 5 August 2013, Mr. Stoll made an unannounced visit to the Krings. Upon driving up, he saw Ms. Davidson run past the living room window into the rear of the house. Mr. Stoll was invited in by Mr. Kring and a conversation ensued. Mr. Kring confirmed that Ms. Davidson was hiding in the back bedroom. Mr. Stoll knocked on the bedroom door and asked her to come out. Both parties agree there was a confrontation between the parties in a three-foot wide hall way outside the bedroom. What happened next is dependent upon the credibility of Ms. Davidson and Mr. Stoll, as there were no other witnesses to the alleged assault. In the police report, Ms. Davidson told Trooper Umphrey that she and Mr. Stoll were fighting over the box of gloves "like little kids." She claimed that Mr. Stoll grabbed her right arm and twisted it. There is no mention in the report of Mr. Stoll pushing her, ramming her or pushing her into the door frame. She claimed that Mr. Stoll reeked of alcohol.

**C. Ms. Davidson's deposition testimony.** At her deposition, Ms. Davidson claimed that she was not hiding in the back bedroom but making the bed. She said she was privy to an extended conversation between Mr. Stoll and Mr. Kring over Mr. Kring's violation of his contract with ComForcare. She claims that Mr. Stoll then came to the back bedroom and began to bang on the door. When she didn't answer, he opened the door. According to her, Mr. Stoll had a box of rubber gloves and ComForcare "flow sheet" under his arm. In the doorway, they got into an argument over the ownership of the box of gloves. She testified that Mr. Stoll became angry after she took the box of gloves away from him. She said he "reeked of alcohol." At that point, she said Mr. Stoll violently pushed her with both hands against her chest where she struck her right shoulder and head against the door jam. She then testified that he lowered his shoulder in a football stance and rammed her two or three more times into the door jam; both times she struck her head and shoulder against the door frame. The box of gloves and flow sheet fell to the floor and she was eventually able to escape. Mr. Stoll then allegedly pursued her outside where she instructed her alleged former boyfriend, Darren Dilley, who was then unemployed and working for the Krings as a painter, to call the police.

6

**D. Mr. Stoll's version of events.** The plaintiff has chosen not to take Mr. Stoll's deposition or any deposition during the discovery period. During the criminal assault complaint investigation, Mr. Stoll was completely cooperative and gave a statement to Michigan State Police Trooper Michael Umphry.  Again, Mr. Stoll saw Ms. Davidson go into the back bedroom as he approached the house. Mr. Kring invited him inside.  Messrs. Stoll and Kring had an extensive conversation about Mr. Kring's alleged violation of the ComForcare home services agreement. At one point Mr. Stoll went back out to his car to retrieve a copy of the paperwork that Mr. Kring had signed. Mr. Kring confirmed that Ms. Davidson was in the rear of the house. On the kitchen table, Mr. Stoll found a distinctive box of ComForcare-issued gloves and partially filled out "flow sheet" that ComForcare routinely issues to its caregivers. Mr. Stoll picked up these items off the counter and then proceeded to the back bedroom door which was closed. He informed Ms. Davidson that he knew she was there and asked her to come out. Ms. Davidson, not Mr. Stoll, opened the door, and began to curse and threaten him.  She ripped the box of gloves and flow sheet from his hand. When he bent down to pick these items up, she pushed him against the wall. During this time, she began yelling, "you pushed me, you pushed me!"  Ms. Davidson followed Mr. Stoll out the door and she continued to yell accusing him of an assault. Her boyfriend or former boyfriend, one Bernard Darren Dilley, working outside as a painter, then threatened to beat Mr. Stoll so he got in his car and left.  Mr. Stoll immediately returned to the office, and wrote a letter to the Krings apologizing for the disturbance and also wrote a letter to Ms. Davidson, terminating her employment.

    For the balance of the day, Mr. Stoll worked in close proximity with Rae Wireman and the remainder of the office staff. None of them smelled any alcohol on Mr. Stoll's person.

## II.  ANTICIPATED LEGAL ISSUES AT TRIAL

### A. WHETHER MR. STOLL AND COMFORCARE, AS DEFEDANTS AND COUTNER-PLAINTIFFS, AS SEPARATE LEGAL ENTITIES, SHOULD EACH BE GIVEN THREE PREEMPTORY CHALLEGNES.

Each side in a civil case are entitled to three preemptory challenges.[7] The Court has discretion to consider more than one plaintiff or defendant a single entity or award three preemptory challenges to each separate entity.[8] Although represented by the same counsel, Mr. Stoll and ComForcare are separate legal entities. Dawn Stoll has an equal ownership interest in the corporation and her interest could be adversely affected if the company is not given the opportunity to select a fair and impartial jury though the exercise of preemptory challenges. In its answer, ComForcare has asserted for example, that Mr. Stoll's actions, if believed, were committed outside the scope of his employment  - an antagonistic defense. The petit jurors may harbor different attitudes toward an individual and small business corporation. Both co-defendants and counter-plaintiffs are requesting that Court that they each be given three preemptory challenges.

### B. WHETHER KENNETH'S STOLL'S ACTIONS AS ALLEGED BY MS. DAVIDSON CONSTITUES STALKING.

In Michigan, stalking is "a willful <u>course of conduct</u> involving <u>repeated or continuing harassment</u> of another individual" whereby the victim of repeated or continuous harassment - actually is, and a reasonable person would be, caused to feel terrorized, frightened, intimidated,

---

[7] 28 U.S.C. § 1870 provides: In civil cases, each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.

[8] Id.

8

threatened, harassed, or molested. (emphasis added)[9] Specifically, "course of conduct' "means a pattern of conduct composed of a series of <u>2 or more separate</u> noncontinuous acts evidencing a continuity of purpose."[10] In turn, "harassment" is defined as: "conduct directed toward a victim that includes, but is not limited to, repeated or continuing <u>unconsented contact</u> that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress."[11] (underscore added) "Harassment does not include constitutionally protected activity <u>or conduct that serves a legitimate purpose</u>."[12] The petitioner has the burden to prove the conduct has no legitimate purpose.[13] An employer contacting an employee about employment matters serves a legitimate purpose.

Assuming that Ms. Davidson's testimony to date regarding Mr. Stoll's alleged stalking behavior is true (which is not the case), Mr. Stoll is entitled to judgment on this issue as a matter of law. Specifically, Ms. Davidson has alleged, but is unable to carry her burden of proof, that there was more than one incident of unconsented contact by Mr. Stoll after she had allegedly indicated that she did not want any more assignments on 27 June 2013.[14] Even the August 5th incident had a legitimate purpose, in Mr. Stoll attempting to remind Ms. Davidson of her

---

[9] MCL 750.411h(1)(d); *Nastal v. Henderson & Assocs. Investigations, Inc.*, 471 Mich 712, 691 N.W.2d 1 (Mich. 2005); *see also* MCL 600.2954 (providing that a plaintiff "may maintain a civil action against an individual who engages in conduct that is prohibited under section 411h or 411i of the Michigan penal code").

[10] MCL 750.411i (a).

[11] MCL 750.411h(c)

[12] *Id.*

[13] Footnote 8, *Nastal, supra.*

[14] Again, Ms. Davidson swore in her PPO petition that "he came to my house (on June 10th) because I never returned his calls or texts." Unconsented contact cannot be found in the context of an employer-employee relationship if the employee never communicates with the employer that they quit or do not want further contact. Ms. Davidson's phone records indicate that she had a four-minute phone conversation with Mr. Stoll on the 10th. She initiated the call. Assuming her version of events that she informed Mr. Stoll she had quit, the next contact with Mr. Stoll occurred on 27 July 2013 where she returned Mr. Stoll's voice mail messages. The next contact between the parties occurred August 5th, the date of the alleged assault. Under these facts, assuming everything Ms. Davidson says is true, it does not constitute stalking as a matter of law. (There was also an incidental encounter at the Greenville Walmart between the parties at an unspecified date that also does not constitute stalking.)

contractual responsibility and consequences for entering into a private pay relationship. In any event, once Ms. Davidson has been fully heard on this issue, Mr. Stoll anticipates moving to dismiss Ms. Davidson's stalking complaint under Rule 50.

### C. WHETHER MS. DAVIDSON CAN SUSTAIN HER BURDEN OF PROOF FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

In Count III of her complaint, Ms. Davidson alleges that Mr. Stoll's conduct in stalking her also constitutes an intentional infliction of emotional distress.[15] Ms. Davidson asserts no facts beyond Mr. Stoll's alleged stalking or one instance of alleged battery to support this allegation. In essence, it's a mere restatement of plaintiff's civil stalking and assault complaint. This allegation will also be subject to Mr. Stoll's summary judgment motion under Rule 50.

To sustain a cause of action for intentional infliction of emotional distress, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[16] "It is initially for the trial judge to decide whether defendant's conduct might reasonably be regarded as so extreme and outrageous to allow recovery for intentional infliction of emotional distress."[17]

At the conclusion of plaintiff's proofs, the Court will have little difficulty finding that Ms. Davidson's has failed to meet her burden of proof regarding Mr. Stoll's alleged stalking. Since the intentional infliction of emotional distress is premised upon a finding of stalking[18], this count of plaintiff's complaint must also fail.

---

[15] See Complaint, ¶¶ 38-41. It is unclear if she also claims that the alleged battery also contributes to this finding.

[16] *Sawabini v. Desenberg*, 143 Mich App 373, 383; 372 NW2d 560 (1985).

[17] *Id*, at 383.

[18] There no authority to suggest that one alleged batter or assault and battery may also constitute an intentional infliction of emotional distress.

10

Moreover, since plaintiff has not claimed that she has suffered any additional damages from intentional infliction of emotional distress, beyond the alleged damages for battery and stalking, the claim is unsustainable as a matter of law. Where two torts overlap a plaintiff may bring an action in both torts as long as damages are not duplicated.[19]

### III. COMFORCARE'S AND MR. STOLL'S COUNTER-CLAIMS

A. BREACH OF CONTRACT

ComForcare's business model is premised upon the employment contract and personal integrity of their caregiver employees not to solicit or enter into private care arrangements with their clients. On 26 Apil2013, Ms. Davidson, along with six other newly hired ComForcare employees, as part of the orientation process, received and acknowledged receipt of the ComForcare Employee Handbook. The acknowledgement form Ms. Davidson signed and dated, will be admitted into evidence.

The acknowledgement form, dated 26 April 2013, contains the following unambiguous language immediately above Ms. Davidson's signature.

> "Furthermore, I understand that I am not permitted to make any private employment arrangements with ComForcare's clients or their families. I understand that any such anangement is grounds for immediate termination and may result in my being liable to ComForcare for any damages and/or costs ComForcare suffers as a result of such an arrangement. These costs may be in excess of $5,000.00.

---

[19] *Sawabini, supra,* 143 Mich App at pp 383, 384, citing *Kollenberg v. Ramirez,* 127 Mich.App 345, 353, 339 N.W.2d 176 (1983).

11

Ms. Davidson's separate agreement not to compete in the acknowledgement form was also supported by the consideration of continued at-will employment. The agreement not to compete is a part of the acknowledgement form itself and there is nothing to indicate that Ms. Davidson did not intend to be bound by that agreement.

Because the acknowledgement form creates an independent enforceable agreement and is not ambiguous, Ms. Davidson is bound by the provision where she agreed not to enter into private care arrangements with ComForcare's clients and their families. Unlike the non-compete provision in the employee handbook, the acknowledgement form does not contain the $15,000 provision for liquidated damages.

In its 28 July 2015 Opinion regarding Plaintiff's Motion for Summary Disposition, the Court ruled that the Employee Handbook, which also contained a broad disclaimer that the document was not a contract, could not be the basis for Comforcare's Breach of Contract Claim. However, the Court further decided that the jury may decide that the corresponding Acknowledgement Form may form the basis of an enforceable agreement not to compete.[20]

### B. RELEVANCE AND ADMISSIBILITY OF THE COMFORCARE EMPLOYEE HANDBOOK

Counter-plaintiffs' theory of their case in part is that Ms. Davidson, despite her adamant denials, received a copy of the Comforcare Employee 39-page Comforcare Employee Handbook at the 26 April 2013 orientation, along with six other newly hired home-care workers.[21] That the two month period that she engaged in a private-pay relationship and before, she was keenly aware of its contents and the potential consequences of her actions. The Employee Handbook, provided in pertinent part as follows:

---

[20] Opinion, 07-28-2015, pp 8-12.

[21] The six other newly hired Comforcare employees, most of whom no longer work for the company, are expected to testify that each received a copy of the handbook and a few still have kept theirs from the orientation. Ms. Manners and others also recall that Ms. Davidson received a copy of the handbook.

> [a]ny employee who makes a private arrangement with a client will cause ComForcare to incur substantial economic damages and losses of types and in amounts which are difficult to compute and ascertain. Accordingly. in addition to any other relief to which ComForcare may be entitled (equitable, monetary and otherwise), ComForcare shall be entitled to liquidated damages the greater of either:
> a) ten times (10x's) the largest bi-weekly service charge/bill charged for such services in the past for client who is involved in such an agreement, or b) 15,000.00, plus all related attorney/court costs ComForcare incurs in enforcing the Client Service Agreement. Such liquidated damages are intended to represent a reasonable approximation of actual ComForcare damages and is not a penalty. Employee will be required to pay this amount upon ComForcare's demand

That the Court subsequently ruled that the above provision in the employee handbook cannot form the basis of a contract does not negate that at the time, Ms. Davidson *believed* that the provision was enforceable. That she subsequently claimed during her answer, interrogatories and deposition not to have been given a copy of the handbook, despite overwhelming evidence to the contrary, was her attempt to escape the monetary penalty she *thought* would be imposed upon caretakers who enter into private pay relationships. Ms. Davidson thought she could escape the sanctions by simply claiming that she did not receive a copy of the handbook.

The counter-plaintiffs' further allege that Ms. Davidson's decision to falsely claim that Mr. Stoll had assaulted her was also motivated in part by her desire to escape the above-stated minimum $15,000 penalty. When Mr. Stoll discovered she had entered into a private-pay relationship, there is compelling evidence that in her mind, she was responsible for a minimum $15,000 in damages.

While the Employee Handbook is not admissible as the basis of an enforceable contract, it is relevant and admissible to show Ms. Davidson's motivation for falsely accusing Mr. Stoll of battery and also speaks to her lack of credibility on a material issue.

"Relevant evidence" means evidence having <u>any tendency</u> to make the existence of <u>any fact that is of consequence to the determination</u> of the action more probable or less probable than

13

it would be without the evidence.[22] (Emphasis added) The rule is broad and encourages the admission of as much useful information as possible in making judicial determinations.

Relevance is not the same as sufficiency. The fact that an item of evidence is not sufficient, or in other words does not necessarily prove what one is trying to prove, does not mean that the evidence is irrelevant.[23] Subject to certain narrow exceptions, all relevant evidence is admissible.[24]

The danger of confusion of the issues under FRE 403 is addressed by the jury instruction that would allow this evidence for the limited purpose of determining Ms. Davidson's motive for her false claim of battery and stalking.[25]

The proffered evidence also is relevant to determining Ms. Davidson's credibility on a material fact. It is always permissible upon cross-examination of an adverse witness to pursue facts bearing on their bias and credibility.[26] A witness's credibility is a primary question for the jury to evaluate, and questions eliciting bias, prejudice, or interest are appropriately allowed within the trial court's discretion.[27]

The remaining issues in this trial are factual determinations within the province of the jury. The jury will weigh and consider Ms. Davidson's allegations, including whether Mr. Stoll battered her as alleged, the reason Ms. Davidson underwent elective surgery for a pinched nerve

---

[22] FRE 401

[23] The Michigan Supreme Court has specifically distinguished relevance from sufficiency. In quantitative terms, the fact that a piece of evidence has some tendency to make the existence of a fact more probable, or less probable, does not necessarily mean that the evidence would justify a reasonable juror in reasonably concluding the existence of that fact beyond a reasonable doubt. See Wade and Strom, Michigan Courtroom Evidence, ICLE 1989, p. 71 3. *People v. Hampton*, 407 Mich. 354, 368 (1979)

[24] FRE 402.

[25] **M Civ JI 3.07 - Evidence Introduced for a Limited Purpose**
If I admitted evidence for a limited purpose, you must not consider that evidence for any other purpose.

[26] *Altemose Construction Company v. NLRB*, 514 F.2d 8, 13 (3rd Cir. 1975).

[27] *Stadium Auth v Drinkwater*, 267 Mich.App. 625, 653; 705 N.W.2d 549 (2005).

in her neck, the one year delay in her alleged onset of symptoms and corresponding delay in bringing this lawsuit. This, along with the issues presented in the counter-claim, are factual determinations within the province of the jury.


Dated: 18 April 2016                     /s/ Thomas A. Ginster
                                         _____
                                         Thomas A. Ginster (P-40243)
                                         Attorney for Defendants and Counter-plaintiffs
                                         203 S. Lafayette St., PO Box 106
                                         Greenville, MI 48838
                                         (616) 754-5303
                                         e-mail: ginster@lawyer.com