UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DEBORAH K. MURPHY-DAVIDSON, an
individual,

        Plaintiff/Counter-Defendant,

    v.                     File No. 1:14-CV-779

KENNETH J. STOLL, an individual,
and COMFORCARE SENIOR SERVICES
MID MICHIGAN, a limited liability
company,

        Defendants/Counter-Plaintiffs.
_____/

Excerpt of Jury Trial
Plaintiff's/Counter-Defendant's Opening Statement

Before

THE HONORABLE RAY KENT
United States Magistrate Judge
April 26, 2016


APPEARANCES


FREDERICK J. BONCHER        THOMAS A. GINSTER
601 Three Mile Rd., NW      203 S. Lafayette
Grand Rapids, MI 49544      P.O. Box 206
Attorney for Plaintiff/     Greenville, MI 48838
Counter-Defendant          Attorney for Defendants/
                             Counter-Plaintiff


Digital audio recording transcribed by:

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter

```
 1                                    Grand Rapids, Michigan
 2                                    April 26, 2016
 3                                    9:47 a.m.
 4                         -    -    -
 5
 6              P R O C E E D I N G S
 7                        *    *    *
 8        MR. BONCHER:  Thank you, Your Honor.
 9        THE COURT:  And Mr. Boncher, I know you remember
10   this, but both lawyers please remember we have a 30-minute
11   time limit on your opening statements.
12        MR. BONCHER:  I timed it last night and I came out
13   with 27 minutes, Your Honor.
14        THE COURT:  Perfect.
15        MR. BONCHER:  Hopefully I don't speak too slowly
16   today.
17        Well, thank you again for giving up your time and
18   your other pursuits and your work and leisure time and time
19   spent with your family to serve as jurors in this case.
20   That's why we have a free country, because of people like you.
21        I've already introduced Debbie Davidson, that's how
22   I'll refer to her, as my client in this.  Susan Knoll is one
23   of the attorneys from our office, and on Wednesday another
24   attorney, Tyler Osburn, will be here assisting me because
25   Susan has to be in another courtroom that day.
```

1          I want to first of all kind of give you an overview

2     of the facts and then get into a little more detail explaining

3     what we expect the evidence to prove.  And the main incident

4     involved in this case happened on August 5th, 2013, and that's

5     when we claim there was an assault and battery.  Debbie will

6     testify to that as well as some other disinterested witnesses,

7     Mr. and Mrs. Donald Kring.  She's also alleging besides

8     assault and battery stalking and intentional infliction of

9     emotional distress.

10          Now, let me tell you some of the background leading

11    up and some of the important facts.  First of all, Debbie's a

12    certified medical assistant, and she's probably overqualified

13    for the job she was doing as a home health care worker, which

14    was only an eight-dollar-or-so-an-hour job.  But she took that

15    job and on April 27th, 2013, attended a ComForcare

16    orientation.  At that time she was shown some documents, but

17    she wasn't able to keep them or review them because

18    unfortunately she had to go take a urine test, and this will

19    be the evidence.  And when she was out taking a urine test,

20    she had to do it twice and wait in between for obvious

21    reasons, and by the time she came back, they had already

22    scooped up all the paperwork.  So she never really had an

23    employee handbook or never really got any of the documents,

24    one of which she signed.

25          Her first day of work was for the Krings, this

1    elderly couple who were in their late 80s, and since Mr. Kring

2    has now passed away.  On May 1, 2013, she started working for

3    them nine hours a day.  The Krings on June 3rd, 2013, and the

4    evidence will show this clearly, they terminated, and

5    according to their undisputed testimony they terminated

6    because they felt they had no longer any need for ComForcare's

7    services.

8         Then between June 3rd and August 8th, 2013,

9    Defendant Stoll appears three or four times at the home of the

10   Krings, and she started living with them in mid-July because

11   she had lost her living arrangements with a girlfriend because

12   her girlfriend's boyfriend came back, and the Krings liked

13   Debbie and asked her, you know, you don't have a place to

14   stay, come live with us.  So mid-July she started living with

15   them, and these dates, you'll see and hear them repeated and

16   they're very important.

17        Debbie resigned, going back a little bit, on June

18   7th from her job with ComForcare.  On June 3rd the Krings

19   said, you know, we don't need you anymore.  Deb was only

20   working for the Krings.  On June 7th she resigned, and on June

21   10th the defendant has acknowledged that as of at least that

22   time at the very latest, that they knew that she had resigned

23   from her employment.

24        On June 10th also, and this is part of the evidence

25   of the stalking, Mr. Stoll entered Debbie's home without

1   permission looking for her and came in.  He said he knocked

2   three times and the door opened and he went in and confronted

3   her boyfriend who was there, and they -- you know, the

4   boyfriend obviously told him to get out.  But Mr. Stoll went

5   in without any permission to her home, said he didn't see her

6   car there and he was worried about her.  I don't think that

7   rings very true when you look at the facts as a whole, but

8   that's one of the evidences of stalking.

9        Then between June 7th and June 27th she received

10  many phone calls even though as of June 10 they knew that she

11  was no longer employed, phone calls from ComForcare and Mr.

12  Stoll, and he admitted that he had told one of his employees

13  to try and call her from time to time.  He also followed her

14  around at Wal-Mart when she was at Wal-Mart and she'd see him

15  and go to a different department.  He'd appear again and be

16  staring at her.

17       He also followed her around Meijer.  In fact, she'll

18  describe a Meijer incident where she was in the lingerie

19  department and he was pretending to look at things all the

20  time while he was staring at her.

21       So we think there's more, many instances of

22  stalking, and as the judge will instruct you, there only has

23  to be two or more instances to qualify.  In fact, Michigan,

24  unlike a lot of states, has an actual statute on stalking that

25  defines what stalking -- what certain specific items are

1    considered stalking by the legislature.

2            Then on June 27th, during this period of time Debbie

3    says, Quit calling me, you know.  I don't want any contacts.

4    But nevertheless, on August 5th Debbie was at the home of the

5    Krings and she was assaulted by Mr. Stoll, and this -- I'll

6    turn this on.

7            Debbie's prepared a diagram, and this is just

8    demonstrative evidence.  You won't be able to take this back

9    to the jury room.  But the Englands were the daughter and

10   son-in-law of the Krings.  This is the Krings' house and

11   here's the driveway.  Debbie's car was parked over here.  The

12   front door is here.  And Mr. Stoll himself admitted that he

13   came in and peeked in the window, and Debbie will describe how

14   she saw him like that, what we used to call a peeping Tom when

15   I was young.

16           And the Krings were in here.  They let Mr. Stoll in.

17   He knocked on the door and he started to get into an argument

18   with them about claiming they breached a contract by hiring

19   Debbie, and they didn't understand that.  There was a very

20   loud argument.

21           Meanwhile Mr. Stoll had seen Debbie go from one side

22   of the house going to the bathroom on the other side of the

23   house, and he came through without permission after being let

24   in the front door and talking to the Krings, came back through

25   the house, got in an argument with Debbie, went through her

1    purse, threw stuff, dumped out her purse over by a table and

2    dumped out her nursing bag which had her stethoscope and other

3    things in them, grabbed a box.  It was just a box that had

4    been given to her with gloves.

5          She'll testify that they gave her gloves originally

6    and she got two packages, but then she ran out of gloves and

7    kept calling and they didn't provide her any more gloves, so

8    she had to buy gloves which were a different color than the

9    gloves they provided to her.  And he said, You have my box and

10   my gloves.  Well, they were gloves she bought and they were in

11   a box that they gave her.

12         He tore that up and he threw things around, and then

13   he slammed her into the doorjamb and injured her very

14   severely, bruised her breast by pushing her like this, rammed

15   the door like a linebacker, twisted her arm, and caused some

16   very severe injuries that, you know, unfortunately have now

17   degenerated even more so that she's I would say totally

18   disabled.  But those are the facts that happened very briefly

19   back on August 5, 2013.

20         Mr. Kring (sic) was, we contend, acting as an agent

21   for ComForcare because he was having arguments with the Krings

22   and Deb about breaching contracts with them.  He and his wife

23   own this business, or she owns it technically and they manage

24   it together.  So it's not like he was some employee without

25   authority from the higher-ups.  He was the higher-ups.  He was

1    the guy who ran it.  And he had paperwork that he was accusing

2    the Krings of breaching a contract, poor old couple that

3    didn't know what was going on.  He yelled and screamed at

4    Debbie, pushed her around, injured her greatly.  So one of the

5    issues you'll have to determine is whether he was acting as an

6    agent of ComForcare at the time as well as acting as an

7    individual.

8         Truly a really sad situation with him pounding on

9    the door.  Mr. Kring heard -- the Krings were up in the front

10   of the house.  They didn't see what was happening and they

11   were, you know, in walkers and stuff, you know, semi-invalid.

12   I would call them invalids.  That's why they needed care in

13   the first place.

14        But they'll testify, and they'll testify by a

15   transcript of a hearing that was held, that they heard Deb

16   say, You pushed me, and they heard the screaming and heard her

17   yelling.  Mr. Kring said that Stoll terminated talking to me,

18   stomped on, went in and started yelling and screaming for

19   Deb.  So it was a very vicious attack and very outrageous

20   actions, and that's one of the things you have to determine.

21        There was a -- she had -- Mr. Stoll will say, Well,

22   you took my gloves.  Well, he didn't realize that those were

23   gloves that Deb had bought herself and that the box was a box

24   of gloves they had given her.  So his defense on that is just

25   wrong.

1          He was swearing at them, using the F word, and

2     they -- both the Krings and Deb all commented under oath a

3     strong smell of alcohol on Mr. Stoll, although he denies that,

4     that he had been drinking at all.  When he pushed her, he

5     bruised her breast, bruised her elbows, bruised her hips,

6     twisted her arm, slammed her three times on the door frame,

7     hurt her back, hit her head on the door frame.

8          And the Krings were present, couldn't see what

9     happened, but they said that Stoll smelled, quote, strongly of

10    alcohol.  In fact, Mr. Kring testified there was no question

11    in his mind that Mr. Stoll had been drinking as he smelled

12    strongly of alcohol.  Both Mr. and Mrs. Kring testified they

13    were, quote, afraid, end quote, scared or terrified of Mr.

14    Stoll, which as Debbie likewise felt, and that's one of the

15    elements of stalking.  These actions have to cause someone to

16    be frightened or scared or terrified.

17         So we know exactly what they're going to say because

18    they're not available.  They live in Florida now, and in fact

19    they moved to Florida in October of 2013 and then Deb moved

20    down to Florida in a different part of Florida in December of

21    2013.  So we will be reading their testimony, and it will be

22    kind of like the Schenk, Boncher and Rypma players where I'll

23    play the part probably of Mr. Kring.  That's just to make it

24    clear for you as we read the testimony, the questions and the

25    answers.

1    Susan here is going to play the part of the circuit

2    court judge because there was a hearing, what's called a PPO

3    hearing.  Some of you may be familiar with divorces and all,

4    you run into those all the time, personal protection order,

5    where the Montcalm County circuit judge heard the testimony

6    first of all on an ex parte basis where Mr. Stoll didn't have

7    the opportunity to appear, issued a personal protection order

8    against Mr. Stoll based upon testimony given at that hearing.

9    You won't be able to hear that because it wouldn't be fair to

10   Mr. Stoll because he wasn't there.

11   But the second hearing you'll hear the testimony of

12   the Krings because Mr. Stoll was represented by his attorney,

13   Mr. Ginster, and they were there and they were able to

14   cross-examine the Krings at the time.  So that was a hearing

15   the judge continued.  That was a motion to try and terminate

16   the PPO that the Krings and that Debbie had gotten.  The judge

17   ruled that she was going to continue it which would last for

18   six months.

19   After the altercation, Deb yelled, Please, somebody

20   call 911, and the evidence will show Mr. Stoll ran out of the

21   house before the police could arrive.  He admits he took the

22   back roads to go back to his office.  It took him a while to

23   get back there.

24   Despite what both the Krings, the disinterested

25   witnesses who aren't parties to this lawsuit, will testify

1    under oath and what Debbie testified saying about the assault

2    and describing it, ironically Mr. Stoll has claimed that he

3    was in fact assaulted by Debbie.  Of course, he didn't tell

4    the police officer that.  You don't see evidence of that, and

5    of course he had no injuries and he didn't suffer -- go for

6    any treatment.

7              But Debbie waited around for the police officer to

8    call after the 911 call was made to come.  The police officer

9    came.  She gave a report, and then the police officer took a

10   report from her and from the Krings.  Two weeks later when Mr.

11   Stoll was present with his attorney, he gave his statement

12   too.

13             Right after the assault, as soon as the police

14   officer left, Deb went to the emergency room and was treated

15   by Dr. Harold Rumery of Spectrum Health.  He saw her on August

16   5th, the same day.  I think it was about 12:54.  As soon as

17   the cop left, she went in and checked into emergency.

18             He examined her and he noticed she -- he diagnosed

19   post-concussive syndrome, left occipital contusion.  That's a

20   bruise on the back of her head when she got slammed into the

21   door frame.  Migraine, cephalgia, refractory to outpatient

22   care, probably triggered by head trauma.  I mean, that's

23   severe headaches.  Left posterior thorax contusions, that's

24   the middle of her back, with myelofascial pain syndrome and

25   spasms.  You know, he could palpate and find actual spasms of

1   the muscles.  Right shoulder strain and contusion, bruises on

2   her shoulder, and when he jerked her arm like that, it

3   actually affected her rotator cuff.

4            Lateral epicondylitis, right arm.  That's --

5   epicondylitis, it's also called tennis elbow when you

6   hyperextend your elbow.  And also a scratch on her forehead --

7   on her forearm, no bruises yet forming on her forearm.  But

8   she also then had bruises on her breast and everything else

9   and bruises the doctor examined.  She came back two days later

10  because she wasn't getting better and she was still having a

11  lot of pain and stuff, and then shortly after that she moved

12  to Florida.

13           It was the police officer -- the defendant is

14  claiming this is a case of malicious prosecution, that Deb

15  caused him to be wrongfully prosecuted.  Well, it was the

16  police officer, not Deb, who decided to forward his report to

17  the prosecuting attorney.  It was the prosecuting attorney,

18  not Deb, who chose to bring criminal charges against Mr. Stoll

19  for misdemeanor assault and battery.

20           Deb will testify she met with a victims' rights

21  representative even though she was moving away to Florida, but

22  she advised if necessary she'd come back for any trial.

23  Krings moved to Florida; Deb moved to Florida.  The

24  prosecuting attorney never contacted her after that, never

25  told her when a trial would take place, but apparently would

1    know her forwarding address.

2            Then shortly there -- sometime like January, the

3    prosecuting attorney dismissed the charges, quote, without

4    prejudice.  That means that there was no determination that

5    there wasn't an assault.  There was no determination that

6    there was any false police report.  What it means is the

7    charges were dismissed, and we may hear from the prosecuting

8    as to why, but basically without prejudice means it could have

9    been brought back again.

10           Meanwhile, the PPO order had still been going for

11   six months.  Meanwhile Deb and the Krings, all witnesses had

12   moved to Florida.  It was only a misdemeanor charge.  So we

13   don't know, but whatever, the prosecutor in her discretion

14   without any input from Deb dismissed the charges, and she

15   didn't become aware of it until I think a year later.

16           So who's going to be testifying?  What kind of

17   witnesses can you anticipate?  First of all, Deb's going to

18   testify as to her background, her hiring, termination by the

19   Krings of the services of ComForcare on June 3rd.  That's an

20   important date.  Her quitting her job on June 7th.  The

21   defendant admitted that she quit her job as of June 10th.

22   She's going to talk about the assault and battery which I

23   described, meeting with the police, her injuries, her

24   disabilities as a result of the assault, her loss of

25   employment.  She got a job down in Florida working for a

1   dermatology office, and she'll describe how awful that was

2   because of the nerve injuries in her neck.  Her life has

3   frankly become hell.

4          She'll talk about her economic damages to date

5   including lost take-home pay, and under the federal system you

6   look at the take-home pay and she's calculated that.  Her

7   medical expenses that she's incurred and she still owes, some

8   of which she's paid.  She lost insurance.

9          Her past non-economic damages include, among other

10  things, her pain and suffering, disfigurement.  She had a

11  surgery, you know, has a surgery scar on her neck, and she'll

12  tell you how she's expecting to have three more surgeries.

13  She told me the other day I think my neck's going to look like

14  railroad tracks.  Her pain and suffering, her loss of

15  enjoyment of life, embarrassment, mortification, anxiety.

16         She'll give you some estimates of future economic

17  damages considering until age 66 when now with Social

18  Security, that's when we can retire, although some of us have

19  not yet retired.  She'll also talk about her -- what she is

20  expecting in the future as non-economic damages, whether this

21  pain and suffering's going to continue, whether she'll ever be

22  able to go to work, and unfortunately things do not look good

23  for Deb.

24         In fact, this morning she was supposed to come to my

25  office and she was late because when she got up, she was about

1    to leave and started vomiting because of the pain.  That's a

2    daily occurrence for her, just about.  When she was working

3    for the dermatologist, she'd arrive at work and she'd always

4    vomit in the parking lot.

5           From March 30th to May 15th of 2014, she'd just lay

6    in bed 50 percent of the time.  The other 50 percent of the

7    time she'd be vomiting in the bathroom, all because of the

8    pain from this crushed nerve in her cervical vertebrae.

9           She then had her surgery which her doctor will

10   describe.  In fact, you'll see him by a videotape deposition.

11   She suffered pneumonia, blood clots.  Internal herpes zoster

12   she's had twice as a result of the surgery because her immune

13   system's so compromised.  She was in bed for ten months.  At

14   that point she was 75 percent on the bed and 25 percent

15   vomiting in the bathroom.

16          If she sleeps at all, she's in excruciating pain.

17   She may sleep two to four hours a night.  She gets tired, has

18   to rest for everything.  In fact, it takes five or six days

19   for her to drive up here from Florida because she can only go

20   a few miles before she has to stop and get out and rest or

21   vomit in the bathroom.

22          When she -- a typical day, she'll try and heat

23   something in the microwave.  That's about all she can do.

24   She'll take naps all day.  She can't even get comfortable

25   enough to watch TV because she can't stay in one place where

1    she's comfortable to watch a full show on TV.

2            She only showers about every three to five days

3    because it's too exhausting to bathe herself and wash her

4    hair.  She'll testify that she has to rest for like two hours

5    because she doesn't have any energy left just from taking a

6    shower and washing her hair.

7            She can't do any vacuuming or anything like that.

8    She can't -- can only use really one hand.  She can't type on

9    a computer.  She can't even look on a computer because it

10   hurts to put her head down like that for any period of time.

11   She can't dust.  Cleaning the bathroom is difficult.  She

12   can't clean the shower.

13           Fortunately, Brian Jones is her fiance, and

14   everybody should have a fiance like him that cares for you

15   every day and puts up with her despite all her pain and

16   dizziness and her inability to drive anywhere.  She's totally

17   dependent upon him.  She can't have any sex because the

18   exertion's too painful.  She used to like to cook fancy meals,

19   make jewelry.  She can't look down to work on jewelry.  She

20   can't do her computer, can't type.

21           She used to be very prideful of her appearance, as

22   fortunately all of us want to be.  That obviously not only

23   affects the way she looks, but the way she feels.  She has no

24   quality of life at all.  She has anxiety, stress and fear.

25   She feels like her personality has changed.  She doesn't trust

1    strangers.  She's afraid of other people.  She wakes up with

2    nightmares.  Her personality has changed.  In other words, her

3    damages are just excruciating and she'll describe all that.

4              As I said, you'll hear from Dr. Arthur Browning, her

5    treating physician in Florida who continues to care for her.

6    His testimony will be by videotape.  We can take a videotape

7    deposition now, which is a little more interesting for you

8    than somebody dryly reading what a doctor says by a

9    deposition, but you'll actually get to see him testify.  He's

10   out of state and not able to be brought here, so the Court

11   allows us to do that.

12             Dr. Browning is going to testify among other things

13   that, one, Deb has gotten worse since he first started

14   treating her.  Two, she has damaged her peripheral nerves,

15   especially in her back.  Three, he prescribed physical therapy

16   for her, but that was successful.  He's prescribed facet

17   injections into her neck with topical steroids and medication,

18   a very dangerous thing to do -- they have to put it in just

19   right into your neck; if they don't, you can be paralyzed from

20   the neck down -- with a long needle.

21             She was in a great deal of pain every time he saw

22   her.  He found this need for cervical decompression, went

23   through the front of her neck, leaving that scar.  She's got

24   continued pain.  She had the blood clot, pneumonia from the

25   surgery, unable to work, unable to return to work.  And he'll

1    say that the cause of all of her problems was the assault and

2    battery by Mr. Stoll, and there was no other cause of those.

3           She can't engage in any sports activities.  She's

4    not faking her injury.  He'll testify her pain is consistent

5    with his objective findings.  She's in constant pain, need for

6    meds.  She has constant very severe headaches and elbow

7    problems and shoulder problems.

8           On behalf of the plaintiff, after Deb and then we

9    hear from the Krings, we'll be playing the parts of the

10   Krings, and Dr. Browning, then the plaintiff will rest and

11   we'll conclude our case-in-chief.  Defendant will then bring

12   their case, and I'm sure Mr. Stoll is going to present a

13   different story.

14          He'll claim that, oh, there was no assault.  I never

15   touched her.  In fact, she assaulted me.  And yet you'll hear

16   from the disinterested non-party witnesses, the Krings, that

17   give a totally different story than Mr. Stoll's.

18          The defendants have also brought counterclaims as

19   you heard the judge indicate against Deb, including breach of

20   contract, and I think the testimony is going to show that

21   there was no breach of contract by Deb at all because the

22   contract would require her to be working for someone else

23   other than ComForcare while she was employed.  But the

24   evidence is clearly going to show that the Krings fired

25   ComForcare on June 3rd.  Deb quit shortly thereafter.

 1          She did go and do some work for the Krings after she

 2   moved in with them.  In mid-July they asked her to move in.

 3   And in August, the first week of August, she was willing to

 4   help them out because they apparently needed a little bit of

 5   help.  But that was two months after her employment was

 6   terminated, so she didn't violate any contract, and I think

 7   you'll find that very clear.

 8          Also, they will bring a cause of action for -- and a

 9   counterclaim for not only breach of contract, but for

10   malicious prosecution and intentional interference with

11   contractual relationships.  The judge briefly told you what

12   those causes of actions were, and it's important that you

13   think about that.  And usually you hear all these at the end

14   of the jury trial, what your jury instructions are, which I

15   think jurors are at a disadvantage when you hear at the end,

16   you know, what you're supposed to be deciding on.  So the

17   judge thankfully already gave you some idea what to expect on

18   what has to be proved, and I want to just briefly go over some

19   of that as well.

20          First of all, on the assault and battery, we have to

21   prove that plaintiff -- that there was an intentional engaged

22   in an attempt to cause physical injury to the plaintiff.

23   That's an assault.  If you bring your fist back, that's an

24   assault.  When you connect, it becomes a battery.  We're

25   claiming assault and battery.  He pushed her.  He threatened

1    her.  That's an assault, and then the battery is the actual

2    infliction of violence.  So we think that's very clear.

3           Civil stalking, as the judge said, the defendant

4    engaged in a civil -- in a willful course of conduct involving

5    repeated or continuing harassment of the plaintiff, and that

6    can include as set forth in the Michigan statute following or

7    appearing within the sight of that individual.  He came to her

8    house on June 10th uninvited, walked in, almost a breaking and

9    entering.

10          Approaching her, confronting that individual in a

11   public place.  She'll testify that happened both at Meijer's

12   and at Wal-Mart and also at the home of the Krings.

13          Appears at the individual's workplace or residence.

14   Well, there's another one which he went to her house on the

15   10th and also then on the 5th of August.

16          Entering or remaining on property occupied by the

17   individual.  He came in, you know, went through the house not

18   when -- he was invited into the front room, but then he went

19   beyond that scope of invitation to the back.

20          Contacting that individual by telephone.  She'll

21   testify there were a number of calls to and, you know, from,

22   you know, texts and calls.  We only need two incidences and

23   there are probably 15 or 20 altogether.

24          Placing an object on property owned or leased by

25   that individual.  Well, he admits he went in and put his card

1     at her house when he came in when she wasn't home.  So we

2     think that you're going to find that the stalking is going to

3     be clearly proved as well.

4               Intentional infliction of emotional distress.  As

5     the judge said, that has to be the defendant engaged in

6     outrageous conduct.  I think you'll find that the conduct of

7     Mr. Stoll was outrageous, and also that he was acting within

8     the scope of his employment because he was trying to enforce

9     or argue about contracts with ComForcare, not with him

10    individually.  Also, that she suffered severe distress.  I

11    think you'll find that as well.

12              On the intentional interference with contractual

13    relations, one of the defendant's claims, first of all, they

14    have to show that she knew of an existence of a contract

15    between the Krings and ComForcare, and you'll find the

16    testimony is she didn't know of any contract.  Nobody ever

17    told her, never gave her -- in fact, the Krings didn't even

18    know of any contract they signed, which their testimony, if

19    not clearly state, will certainly imply.

20              Second of all, the defendant has to show that

21    somehow Debbie unjustfully and intentionally instigated or

22    persuaded the party, the Krings, to terminate the contract.

23    Well, the Krings will testify that we decided to terminate the

24    services, they didn't know about the written contract, because

25    we didn't need them anymore.  So there will be no proof of

1    that either.

2              Third of all, the defendant showed -- suffered

3    damages as a result of this interference with contracts.

4    Well, the testimony will show that ComForcare and Mr. Stoll

5    knew what the credit card number was of the Krings and without

6    their authorization charged $5,000 to their credit card.  So

7    besides that being pretty outrageous conduct, it also shows

8    they had no damages from any breach or interference with

9    contractual relationships.

10             And then on malicious prosecution, they have to

11   prove there was a false criminal complaint.  Well, they've got

12   the Krings talking about what they witnessed in the assault

13   and battery as well as Deb, so it certainly wasn't false.  And

14   that she knew that the complaint was false.  Well, she didn't

15   know the complaint was false because it was true.  And

16   finally, that she undertook to make a police report for malice

17   and reasons other than proper reasons like making sure that

18   someone who commits an assault and battery is brought to

19   justice.

20             So when you see all those facts, think about those

21   elements, and you'll hear the jury instructions at the end,

22   and I think you are going to agree with me that plaintiff will

23   have proved her case by the preponderance of the evidence,

24   swinging the scales of justice in her favor, and that she will

25   have proven tremendous injuries and damages that you have to

1   come up with a figure on, which I always struggle with.  You

2   know, it's easy to, you know, get some figures on economic

3   damages like lost wages, but how do you put a number on pain

4   and suffering probably for the rest of your life and the way

5   she goes through every day?

6            And we also believe that at the end of all the

7   trial, at the end of your deliberations, you'll find that

8   there's no basis whatsoever for the claims, the counterclaims

9   of the Defendant ComForcare and the counterclaim of Defendant

10  Stoll.

11           With that said, I think I made it under a half hour.

12           THE COURT:  You did.

13           MR. BONCHER:  Thank you, Your Honor.  That's unusual

14  for me, as you know.

15           Thank you once again, sincerely.  You know, I was in

16  the service during Vietnam for a time and I saw a lot of brave

17  people who served their country.  You're serving your country

18  here today.  Thank you.

19                    (End of excerpt.)

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, Kevin W. Gaugier, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth.

I do further certify that the foregoing transcript was prepared by me.

/s/  Kevin W. Gaugier

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter
110 Michigan N.W.
622 Federal Building
Grand Rapids, MI 49503